UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| G.A. and W.A., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) NO. 3:20-cv-00741 |
| | ) |
| WILLIAMSON COUNTY BOARD OF EDUCATION, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Plaintiffs in this matter are a disabled teenager, G.A., and his mother, W.A. They contend that Williamson County Schools ("WCS") violated the Individuals with Disabilities Education Act ("IDEA") by failing to offer a free appropriate public education to G.A. when W.A. attempted to transfer him from a private school into a WCS school for his seventh-grade year. An Administrative Law Judge ("ALJ") previously denied Plaintiffs' requested relief. Plaintiffs then sued in this Court and filed a Motion for Judgment on the Record ("Motion") (Doc. No. 35), asking the Court to overturn the ALJ's decision. The Court will deny the Motion.

**I. BACKGROUND**

    A.    <u>G.A.'s Educational History</u>

G.A. has significant mental and physical challenges. (Doc. No. 23-6 at 58–80, 304–06). He has autism, gross and fine motor issues, hearing loss, tinnitus, and sensory processing difficulties. (Id.). He has also previously been diagnosed with depression and anxiety. (Id.).

G.A. attended Currey Ingram Academy ("CIA") beginning in kindergarten. (Doc. No. 23-5 at 93). CIA is a "K-12 private college preparatory school for students with learning disabilities and learning differences." (Id. at 76). After G.A. completed his sixth-grade year at CIA, W.A. emailed

WCS personnel stating that she wanted to enter G.A. in public school for his seventh-grade year (the 2017-2018 school year). (Doc. No. 23-6 at 115). She told the principal of Brentwood Middle School ("BMS")—a WCS school—that she wanted to have G.A. evaluated for special education services. (Id. at 113; Doc. No. 23-3 at 223).

On June 15, 2017, WCS held a meeting to discuss the assessments required for the evaluation,[1] which would ultimately inform the Individualized Education Plan ("IEP")[2] WCS would create for G.A. (Doc. No. 23-5 at 93). W.A. attended the meeting. (Doc. No. 23-6 at 200). The IEP team determined that it would evaluate G.A. for eligibility for special education services under the Autism, Hearing Impairment, and Emotional Disturbance categories. (Id. at 211). It also agreed to examine G.A.'s vision, hearing, academic and intellectual functioning, adaptive behavior, social and emotional abilities, and motor skills. (Id.).

In June and July of 2017, WCS conducted an extensive evaluation of G.A. (Doc. No. 23-5 at 418–19). It reviewed documents provided by W.A.; examined G.A.'s medical records; conducted behavioral observations of G.A.; and administered tests designed to assess G.A.'s areas of need. (Id.).

On August 9, 2017—the day before the first day of the 2017-2018 school year—the IEP team met with W.A. to discuss the results of its evaluation and develop an IEP for G.A. (Doc. No. 23-4 at 147–48; Doc. No. 23-6 at 58; Doc. No. 23-7 at 88–92). The team determined G.A. qualified for special education services under the categories of Autism and Emotional Disturbance. (Doc. No. 23-7 at 90). No determination was made as to G.A.'s eligibility for Hearing Impairment. (Id.). Instead, WCS informed W.A. that it would be six to eight weeks before a hearing evaluation of G.A. could be

---

[1] Technically, this was a "reevaluation" because WCS had found G.A. eligible for special education services in a prior year. (Doc. No. 23-6 at 146).

[2] An IEP is a written document that contains "a specific statement of the child's current performance levels, the child's short-term and long-term goals, the educational and other services to be provided, and criteria for evaluating the child's progress," among other things. Knable ex rel. Knable v. Bexley City Sch. Dist., 238 F.3d 755, 762 (6th Cir. 2001); see also 20 U.S.C. § 1414.

completed, as in-classroom observations were required. (See id.). The IEP team also agreed to complete a supplemental sensory processing evaluation. (Id. at 91). The IEP listed BMS as G.A.'s placement school. (Doc. No. 23-6 at 58).

W.A. did not sign the IEP at the conclusion of the IEP meeting because she wanted more time to review it. (Id. at 80). On August 11, 2017, she emailed WCS, stating that "[b]ased on the school district's recommendation, it is clear that G.A.'s unique needs are not understood and this has resulted in an inappropriate and inadequate IEP and placement." (Doc. No. 23-9 at 138). She said she intended "to place [G.A.] at Currey Ingram and will seek reimbursement from Williamson County Schools for the necessary services and placement." (Id.). On August 24, 2017, she formally withdrew G.A. from BMS. (Doc. No. 23-6 at 139). Five days later, WCS staff met with W.A. to discuss her concerns with the IEP and consider her proposal that G.A. be placed at CIA instead of BMS. (Doc. No. 23-3 at 345–46). After a lengthy discussion, WCS ultimately concluded that BMS was still the most appropriate placement for G.A. (Id. at 346). W.A. disagreed; she kept G.A. at CIA. (See Doc. No. 36 at 21).

From there, it appears W.A. and WCS misunderstood one another's intentions. W.A. expected WCS to move forward with the supplemental sensory processing and hearing evaluations it had agreed to at the original IEP meeting. (Id. at 30). WCS believed W.A. had withdrawn consent for those evaluations by withdrawing from BMS. (See Doc. No. 23-4 at 282–85; Doc. No. 23-7 at 440). Eventually, W.A. contacted WCS about the hearing evaluations, and WCS completed them in January and February of 2018 at CIA. (Doc. No. 23-4 at 286–87). WCS convened another IEP meeting in March 2018 to review the results and revise G.A.'s IEP as necessary. (Doc. No. 23-7 at 253–55). WCS concluded G.A. was not eligible for special education services under the category of Hearing Impairment. (Id.). W.A. refused to sign the IEP and kept G.A. enrolled at CIA. (Id. at 255).

3

B. Procedural History

Plaintiffs filed a Due Process Hearing Request with the Tennessee Department of Education on August 16, 2019, alleging the IEP that WCS had proposed for G.A. violated the IDEA. (Doc. No. 23-1 at 1, 4–5). An ALJ held hearings concerning Plaintiffs' claims in January and March of 2020. (Id. at 2–3). In a Final Order dated June 30, 2020, the ALJ denied Plaintiffs' request for relief. (Id. at 2; Doc. No. 23-2 at 461). Plaintiffs then filed suit in this Court on August 31, 2020. (Doc. No. 1). After further proceedings and attempts at mediation, Plaintiffs filed the Motion on July 2, 2021, arguing they are entitled to judgment on the record. (Doc. No. 35). The Motion has been fully briefed. (Doc. Nos. 36, 41, 43).

## II. LEGAL STANDARD

School districts that receive funds under the IDEA must provide disabled children with a "free appropriate public education" ("FAPE"). Knable ex rel. Knable v. Bexley City Sch. Dist., 238 F.3d 755, 762 (6th Cir. 2001). In support of this goal, school districts must establish an IEP for each disabled child. Id. The IEP "must provide the FAPE so as to educate the disabled student in the 'least restrictive environment'" that is possible under the circumstances. L.H. v. Hamilton Cty. Dep't of Educ., 900 F.3d 779, 788 (6th Cir. 2018) (quoting 20 U.S.C. § 1412(a)). Hence, "[s]pecial classes, separate schooling, or other removal of children with disabilities from the regular educational environment [should] occur[] only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 34 C.F.R. § 300.114.

Where parents "disagree with the appropriateness of an IEP" developed for their child, the IDEA provides a process through which they can "seek relief." Knable, 238 F.3d at 763. "The process begins with a complaint to the school district, followed by a due process hearing at which parents are able to voice their concerns to an [impartial hearing officer] of the state educational

4

agency, as determined by state law." Id. After the hearing, "any party aggrieved" may "bring suit in the appropriate state court or federal district court." Id.

At that point, federal courts apply a "modified de novo standard of review." Id. at 764 (citation and quotation omitted). Under that standard, the Court "should make 'independent decisions' based on the preponderance of the evidence, but also should give 'due weight' to the determinations made during the state administrative process." Id. (citation omitted). Notably, the Court cannot "substitute [its] own notions of sound educational policy for those of the school authorities which [it] review[s]." Id. (quoting Doe By & Through Doe v. Bd. of Educ. of Tullahoma City Sch., 9 F.3d 455, 458 (6th Cir. 1993)).

## III. ANALYSIS

"When parents challenge the appropriateness of a program or placement offered to their disabled child by a school district under the IDEA, a reviewing court must undertake a twofold inquiry." Id. at 763. First, the Court must "ask whether the school district has complied with the procedures set forth in the IDEA." Id. Next, the Court must evaluate whether the school district complied with the IDEA's substantive requirements. Id. The Court finds WCS complied with the IDEA's procedural and substantive requirements.

### A. WCS Complied With the IDEA's Procedural Requirements.

WCS did not violate its procedural obligations under the IDEA. "Procedural violations generally concern 'the preparation of an IEP.'" Somberg on behalf of Somberg v. Utica Cmty. Sch., 908 F.3d 162, 171 (6th Cir. 2018) (citation omitted). Plaintiffs contend WCS' preparation of G.A.'s IEP was inadequate because WCS (1) failed to "evaluate G.A. in all deficit areas," (2) failed to issue "prior written notices" of changes to its evaluation plan for G.A., (3) did not "offer an IEP in a timely manner," and (4) "predetermin[ed] G.A.'s placement at BMS." (Doc. No. 36

5

at 28–32). The Court disagrees.

### 1. WCS Did Not Fail to Evaluate G.A.'s Deficit Areas.

Plaintiffs argue WCS did not adequately evaluate G.A.'s gross motor, sensory processing, and hearing difficulties. (Id. at 29). A school district evaluating a disabled child is required to conduct an evaluation "sufficiently comprehensive to identify all of the child's special education and related services needs." 34 C.F.R. § 300.304(c)(6). Contrary to Plaintiffs' arguments, WCS met this requirement.

To start, WCS adequately evaluated G.A.'s gross motor skills. WCS' occupational therapist testified that she made "observations about [G.A.'s] gross motor activities." (Doc. No. 23-3 at 193, 542). She found that "he demonstrated adequate balance and posturing needed to assume and maintain sitting and standing positions to complete all tasks asked of him." (Id. at 194). G.A.'s IEP also contained findings regarding his gross motor skills based on teachers' prior observations. (Doc. No. 23-6 at 65). It stated G.A. "is able to walk unassisted to class" and "is able to move around the classroom/school independently." (Id.). Further, the IEP included the results of a BOT-2 assessment, which is an assessment of "gross and fine motor" skills (though it focused more on G.A.'s fine motor skills). (Id. at 63–64). The Court finds WCS conducted a sufficiently comprehensive evaluation of G.A.'s gross motor abilities.

Plaintiffs' contrary argument is futile. Plaintiffs complain that "[d]espite having numerous records, including the most recent OT records from Currey Ingram, that indicated G.A. had deficits in gross motor skills, WCS failed to collect any objective data or conduct any gross motor assessments." (Doc. No. 36 at 29). As an initial matter, because WCS had access to "numerous" and "recent" records concerning G.A.'s gross motor skills, that *diminished* its need to collect additional information concerning those skills. Regardless, WCS did evaluate G.A.'s gross motor

6

functions, as described above. The record does not support Plaintiffs' contention that WCS did not sufficiently evaluate G.A.'s gross motor abilities.

Additionally, WCS adequately evaluated G.A.'s hearing abilities. His IEP noted that he had "difficulty hearing due to tinnitus" and "has a hearing aid . . . but chooses not to wear it because it does not help." (Doc. No. 23-6 at 62). The IEP also referenced an "audiological report" with "more detailed information on hearing." (Id.). Plus, the minutes from the IEP meeting show that the IEP team (which included W.A.) discussed how "filtering background noise and sound location is difficult" for G.A. (Doc. No. 23-7 at 91). Further, at the meeting, WCS agreed to conduct additional observations of G.A.'s hearing abilities in the classroom once he started at BMS. (Id.). After W.A. withdrew G.A. from BMS, WCS completed the observations at CIA. (Doc. No. 23-4 at 281; Doc. No. 23-6 at 140; Doc. No. 23-7 at 182–196, 442). The Court finds WCS' evaluation of G.A.'s hearing was sufficiently comprehensive.

Plaintiffs' argument that WCS' hearing evaluation was inadequate because it "did not include an updated audiogram" does not undermine the Court's conclusion. (Doc. No. 36 at 30). WCS did utilize a recent audiogram—from March 2017—in assessing G.A.'s hearing abilities. (Doc. No. 23-4 at 345). And although W.A. would have preferred WCS use an even more recent audiogram, that was unnecessary according to Deanna Arnoldt, the teacher for the hearing impaired who conducted G.A.'s hearing evaluation. (Id. at 271–73, 432–434). She testified that because WCS "already had the audiogram that indicated the [hearing] loss," the "key piece" of G.A.'s hearing evaluation was "the observations in the classroom to document the impact" of that hearing loss. (Id. at 432–434). WCS' decision not to obtain a more recent audiogram did not render its hearing evaluation insufficient.

7

The Court also is not persuaded by Plaintiffs' argument that WCS inadequately evaluated G.A.'s hearing difficulties because it "failed to consider whether G.A.'s hearing would be adversely impacted at the proposed placement, BMS." (Doc. No. 36 at 30). As noted, G.A.'s IEP—which listed BMS as G.A.'s intended placement—outlined G.A.'s hearing difficulties. (Doc. No. 23-6 at 62). Plus, as discussed, WCS planned to conduct observations of G.A.'s hearing abilities in class at BMS. (Doc. No. 23-4 at 281). That plan only changed after W.A. withdrew G.A. from BMS and placed him at CIA. (Id.; Doc. No. 23-6 at 140; Doc. No. 23-7 at 182–196, 442). Based on these facts, the Court cannot conclude that WCS failed to consider whether G.A. could function well at BMS with his hearing difficulties.

Finally, WCS sufficiently evaluated G.A.'s sensory processing. WCS' occupational therapist performed a "sensory profile" on G.A. (Doc. No. 23-3 at 124, 133). The results of this profile were included in G.A.'s IEP, which listed G.A.'s scores in a variety of sensory processing categories, such as "Sensation Seeking," "Sensory Sensitivity," and "Sensation Avoiding." (Doc. No. 23-6 at 61). The IEP also included comments and observations about G.A.'s sensory processing difficulties. (Id. at 62 (describing G.A.'s "extreme dislike of bright lights," his aversion to "crowds and noisy settings," his "poor smell," and his "difficulty working with background noise")). And it noted that G.A. "appeared very aware of his sensory processing needs and how to accommodate these needs." (Id.). Further, the minutes from the IEP meeting show that the team discussed G.A.'s sensory issues at length. (Doc. No. 23-7 at 90). Plaintiffs' complaints concerning WCS' evaluation of G.A.'s sensory processing chiefly concern WCS' alleged decision not to conduct additional assessments without issuing prior written notice. (Doc. No. 36 at 30). The Court will address those complaints below. Here, the Court need only conclude that the assessment WCS did complete was "sufficiently comprehensive." 34 C.F.R. § 300.304(c)(6).

8

### 2. *WCS Did Not Fail to Issue Prior Written Notices.*

A school district must give a parent prior written notice before it "[p]roposes to initiate or change the identification, evaluation, or educational placement of [a] child." 34 C.F.R. § 300.503. Plaintiffs contend WCS was required to issue a prior written notice that it was altering its plan to conduct supplemental hearing and sensory evaluations of G.A. (the former occurred later than planned and the latter did not occur). (Doc. No. 36 at 30). The record contradicts this argument.

WCS was not required to issue a prior written notice regarding its evaluation of G.A.'s hearing. WCS did agree to conduct in-class observations of G.A.'s hearing, over six to eight weeks, at the August 9, 2017 IEP meeting. (Doc. No. 23-7 at 91). And it is undisputed that those observations took place later than originally planned. (See Doc. No. 41 at 11). But that was not due to any decision by WCS. W.A. chose not to sign the IEP. (Doc. No. 23-6 at 80). And she emailed WCS to inform it that she was not enrolling G.A. in BMS and would be enrolling him in CIA instead. (Doc. No. 23-9 at 138). WCS reasonably concluded it no longer had consent to conduct the hearing observations. (Doc. No. 23-4 at 282–85 ("I indicated that the observation would have to be conducted at Currey Ingram in order to comply with the Tennessee Department of Education eligibility requirements and then I requested that [W.A.] let me know if we should proceed with the observations and consultations. I did not receive a response from [W.A.], so we [were] on hold regarding the required observations and consultations.")). Because WCS never "[p]ropose[d] to initiate or change" G.A's hearing evaluation, it was not required to send W.A. a prior written notice of such a proposal. 34 C.F.R. § 300.503.

Similarly, WCS was not required to send a prior written notice regarding its evaluation of G.A.'s sensory processing. At the August 9, 2017 IEP meeting, WCS agreed to conduct "another sensory assessment or inventory based on how [G.A.] is adjusting to the new environment" at

9

BMS. (Doc. No. 23-7 at 90). But after W.A. withdrew G.A. from BMS, WCS never had a chance to conduct this supplemental assessment. The Court cannot conclude, based on these facts, that WCS "[p]ropose[d] to initiate or change" the plan for G.A.'s sensory evaluations. 34 C.F.R. § 300.503. Accordingly, WCS was not required to provide any prior written notice. Id.

        3.      *WCS Offered an IEP in a Timely Manner.*

WCS' proposed IEP was timely. To offer an IEP in a timely manner, a school district must propose it before "the beginning of [the] school year." 34 C.F.R. § 300.323. Plaintiffs do not dispute that WCS offered an IEP for G.A. the day before the 2017-2018 school year started. (Doc. No. 36 at 28 (admitting that "[v]iewed solely by temporal proximity, the day before school is prior to the school year")). Instead, Plaintiffs contend "it was simply unreasonable" that WCS did not present the IEP sooner because of the "complexity" of G.A.'s situation. (Id.). The Court is sympathetic to W.A.'s desire to have adequate time to review her child's IEP before the beginning of the school year. However, because WCS offered an IEP before the legal deadline, the Court must reject Plaintiffs' argument that the IEP was untimely.

This conclusion stands despite WCS' decision to complete post-IEP observations related to G.A.'s possible eligibility under the Hearing Impairment category. (Doc. No. 23-3 at 255–56). The ALJ disposed of this issue by concluding that, at the original IEP meeting, the IEP team "determined that G.A. did not meet the criteria for eligibility under the category of hearing impairment at that time" but agreed to reassess that determination upon further observation in G.A.'s new educational environment. (Doc. No. 23-2 at 487). The Court reads the record the same way. (See Doc. No. 23-3 at 255–56 ("When we initially met I guess on August 9th . . . [G.A.] ended up qualifying for – under autism and under emotional disturbance, and then we did look at hearing due to the hearing loss. However, he wasn't found eligible due to his attendance at Currey

10

Ingram and there not being an educational impact at Currey Ingram, although we determined and agreed in the meeting that we would look at that if he enrolled at Brentwood Middle through observations in the classroom at Brentwood Middle.")).

Notably, even if WCS *was* required to complete its hearing observations before the first IEP meeting,[3] Plaintiffs would not be entitled to relief. "To obtain relief for a procedural violation, [Plaintiffs] must show that the violation caused 'substantive harm' to [W.A.] or to [G.A.]" Barney v. Akron Bd. of Educ., 763 F. App'x 528, 532 (6th Cir. 2019). Here, the delayed observations did not harm G.A. (who was offered hearing accommodations in the initial IEP (Doc. No. 23-6 at 65, 70) and was ultimately found ineligible under the Hearing Impairment category anyway) and did not harm W.A. (who was not deprived of her ability to meaningfully participate in developing G.A.'s educational program). See id. ("Barney says that the school district failed to ensure that she understood J.B.'s program, decided how to address J.B.'s allergy without her input, and impermissibly delayed its 2014 reevaluation of J.B.'s disabilities. But Barney does not identify any part of J.B.'s educational program that she did not understand. Nor does she explain how these alleged violations affected J.B.'s education. Barney thus cannot show that she or J.B. suffered any 'substantive harm' from these alleged wrongs.").

    4.  *WCS Did Not Predetermine G.A.'s Placement.*

The Court must also reject Plaintiffs' argument that WCS predetermined G.A.'s placement. Predetermination occurs where a school district makes premature placement decisions to which it

---

[3] This seems like an impossible task. The hearing observations were originally to take place at BMS. (Doc. No. 23-4 at 367–369). But BMS was out for the summer between the date on which WCS first learned W.A. intended to enroll G.A. in public school (Doc. No. 23-5 at 418) and the date on which the first IEP meeting occurred (id. at 440). See www.williamsonsource.com/wcs-and-fssd-2016-2017-school-calendar (all websites last visited March 22, 2022); www.williamsonhomepage.com/franklin/schools/when-is-fall-break-check-the-2017-18-school-calendars/article_0e43ca65-46b0-513a-ac60-28c6f5e31b58.html.

11

Case 3:20-cv-00741   Document 44   Filed 03/25/22   Page 11 of 18 PageID #: 5528

adheres "regardless of any evidence concerning [the child's] individual needs." Deal v. Hamilton Cty. Bd. of Educ., 392 F.3d 840, 857 (6th Cir. 2004). It also occurs "when the state makes educational decisions too early in the planning process, in a way that deprives the parents of a meaningful opportunity to fully participate as equal members of the IEP team." R.L. v. Miami-Dade Cty. Sch. Bd., 757 F.3d 1173, 1188 (11th Cir. 2014); Nack ex rel. Nack v. Orange City Sch. Dist., 454 F.3d 604, 610 (6th Cir. 2006) (discussing predetermination). "This is not to say that a state may not have any pre-formed opinions about what is appropriate for a child's education." R.L., 757 F.3d at 1188. "But any pre-formed opinion the state might have must not obstruct the parents' participation in the planning process." Id.

Plaintiffs contend WCS predetermined G.A.'s placement at BMS because many of the materials WCS prepared for G.A.'s IEP meeting listed BMS as the educational setting. (Doc. No. 36 at 31–32). This does indicate WCS developed a pre-formed opinion that BMS would be an appropriate placement for G.A. However, that pre-formed opinion did not in any way obstruct W.A.'s participation in the planning process. R.L., 757 F.3d at 1188. To the contrary, it appears WCS was attempting to respect W.A.'s wishes. W.A. first contacted WCS by emailing the principal of BMS and asking to have G.A. evaluated for special education services. (Doc. No. 23-6 at 113). WCS apparently made the logical inference that W.A. wanted to enroll G.A. in BMS and prepared some of its IEP documents with that inference in mind. That is perfectly acceptable, so long as WCS' officials came to the IEP meeting with "open minds" and were "willing to listen" to W.A.'s preferences. Deal, 392 F.3d at 858 (citation and quotation omitted); see also Nack, 454 F.3d at 610 ("[P]redetermination is not synonymous with preparation."). And the record shows that they indeed did. In fact, after W.A. refused to sign the first proposed IEP, the IEP team scheduled a second meeting with her to review her concerns and "consider Currey Ingram

12

Academy as the appropriate placement." (Doc. No. 23-9 at 7; see also Doc. No. 23-3 at 345–46). In these circumstances, that WCS prefilled forms listing BMS as G.A.'s educational setting does not mean WCS unlawfully predetermined G.A.'s placement. Deal, 392 F.3d at 858 ("[S]chool officials are permitted to form opinions and compile reports prior to IEP meetings.").

Plaintiffs also attack WCS' alleged practice under which it does not place students in private institutions, like CIA, based on mental health issues unless a psychiatrist determines the student requires hospitalization (the "hospitalization practice").[4] (Doc. No. 36 at 18). The Court finds this practice concerning. If it is applied without exception, it may well lead to predetermination in certain cases. See Deal, 392 F.3d at 858–59 (finding predetermination where a school had an "unofficial policy of refusing to provide one-on-one [applied behavioral analysis] programs" and noting that a "'one size fits all' approach to special education will not be countenanced by the IDEA"); D.S. by & through R.S. v. Knox Cty., No. 3:20-CV-240, 2021 WL 6496726, at *6 (E.D. Tenn. June 21, 2021) ("Predetermination is often accompanied by a policy—either official or unofficial—regarding the child's placement.").

However, the preponderance of the evidence shows that the hospitalization practice did not lead WCS to predetermine that CIA was an inappropriate placement. As noted, WCS convened a second IEP meeting for the express purpose of considering CIA as a placement for G.A. (Doc. No. 23-9 at 7). WCS heard extensively from W.A. at that meeting and appears to have taken her input seriously. (Doc. No. 23-3 at 346 ("After a lot of discussion and kind of hearing from [W.A.], [and] her concerns with the original decision . . . we did a rereview of the data. I think this meeting

---

[4] There is conflicting evidence in the record as to whether this practice more closely resembles a bright-line rule or a general guideline. Dr. Krista Hogan—a WCS Student Support Specialist—testified that no practice at WCS "prohibits [IEP] teams" from placing students "outside the district in private settings" where the "individual needs of the children" require it. (Doc. No. 23-5 at 134).

13

went longer than the first one that was four hours and 45 minutes. There was a lot of discussion, a lot of reanalysis of the documents that had been provided[.]")). After deciding not to switch G.A.'s placement to CIA, WCS sent W.A. a notice explaining the bases for its decision. (Doc. No. 23-9 at 7). Those bases did not include the hospitalization practice. (Id. at 7–8). Instead, they included considerations such the "teacher/staff ratio," the "availability of counseling supports," and the "class size[s]" at CIA and BMS, as well as G.A.'s "learning strengths and challenges." (Id. at 7). The notice also highlighted that BMS is a public school, whereas CIA is a "private day school with a mission to serve students with learning disabilities."[5] (Id.). The notice concluded that BMS was the least restrictive environment in which FAPE could be provided to G.A., making BMS the appropriate placement. (Id. at 8). The Court concludes WCS did not automatically rule out CIA as an option for G.A. and did not predetermine his placement.

B. WCS Complied With the IDEA's Substantive Requirements.

WCS did not violate the IDEA's substantive requirements. "To meet its substantive obligation under [the IDEA], a school must offer an [educational program] reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Barney, 763 F. App'x at 533 (citation omitted). Plaintiffs contend WCS violated the IDEA by (1) "failing to design an IEP that included objective data and appropriate goals in all areas of disability" and (2) "failing to offer counseling as a related service." (Doc. No. 36 at 27). The Court disagrees.

1. *WCS Did Not Fail to Include Appropriate Data and Goals in G.A.'s IEP.*

The record does not support Plaintiffs' argument that WCS violated the IDEA by failing to design an IEP with objective data and appropriate goals.

---

[5] This is significant because, in order to provide FAPE in the least restrictive environment possible, public agencies are directed to ensure that "[t]o the maximum extent appropriate, children with disabilities . . . are educated with children who are nondisabled." 34 C.F.R. § 300.114.
14

Case 3:20-cv-00741   Document 44   Filed 03/25/22   Page 14 of 18 PageID #: 5531

*First*, the Court rejects Plaintiffs' argument that the "fine motor skills goal" in G.A.'s IEP was inadequate. (Id. at 30). The goal was for G.A. to "self-manage technology to type 4/5 assignments" that were "longer written classroom assignment[s]" as "measured by therapist and teacher observation" on an annual basis. (Doc. No. 23-6 at 69). This goal was based, in part, on WCS' conclusion that G.A.'s "difficulties with handwriting legibility w[ould] negatively impact his ability to independently participate in his classroom and school environment without accommodations and supports." (See Doc. No. 23-6 at 65). In view of that concern, WCS' proposed goal appears "reasonably calculated to enable [G.A.] to make progress appropriate in light of [his] circumstances." Barney, 763 F. App'x at 533.

Plaintiffs contend, to the contrary, that the fine motor skills goal was "erroneous" because it "had already been achieved." (Doc. No. 36 at 30). But that is not what the record shows. The end-of-year progress report from CIA for G.A.'s sixth grade year recommended that G.A. "continue to participate in regular typing practice" and stated that "typing is recommended for [G.A.]" for "all assignments." (Doc. No. 23-5 at 386). This indicates that WCS' proposal that G.A. continue working on his typing skills was not "erroneous."

Plaintiffs further complain that "[w]hile WCS included a typing goal in the IEP it did not include any information concerning the assistive technology device/software that would be provided to support the goal." (Doc. No. 43 at 5). The relevant language from the IEP is its statement that G.A. would receive the "[u]se of technology with notes/assignments" as an accommodation. (Doc. No. 23-6 at 70). Because it is clear the technology at issue would have been a computer, the IEP was not deficient for failing to specifically state as much, contrary to Plaintiffs' argument. (See Doc. No. 23-3 at 188–89 ("[I]f it's in the accommodation [section] that one of the accommodations is allow the student to type assignments, then it's just understood that

15

we're going to be providing something for them to type those assignments on.")).[6]

Plaintiffs also aver that the IEP's fine motor skills objectives "suffered from having no goal at all for handwriting." (Doc. No. 36 at 30). Perhaps, as Plaintiffs suggest, it would have been prudent for the IEP to focus on improving G.A.'s handwriting in addition to accommodating his handwriting difficulties using technology. But "[a]ny review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 137 S. Ct. 988, 999 (2017). G.A.'s IEP passes that standard with respect its fine motor skills goal.

*Second*, the Court disagrees with Plaintiffs' argument that they are entitled to relief under the IDEA because WCS' occupational therapist "failed to share all of the assessment data that she had collected for G.A." with W.A. (Doc. No. 36 at 31). Under the IDEA, states are required to provide "[a]n opportunity for the parents of a child with a disability to examine all records relating to such child." 20 U.S.C. § 1415. Plaintiffs complain that WCS shared neither G.A.'s percentile ranks from the BOT-2 assessment nor the "handwriting samples that WCS' evaluator used" in the ETCH-M handwriting assessment. (Doc. No. 36 at 11, 30 n.17). Assuming these oversights are violations under the IDEA, they are clearly *procedural* violations. 20 U.S.C. § 1415 (requirement that states permit parents to examine records is a "procedural safeguard[]"). So, to get relief, Plaintiffs must show substantive harm. Barney, 763 F. App'x at 532; M.M. v. Lafayette Sch. Dist., 767 F.3d 842, 855–56 (9th Cir. 2014) (citation omitted) ("Having determined that the District procedurally violated the IDEA by not providing the parents with his complete RTI data . . . we

---

[6] The technology accommodation in G.A.'s IEP also defeats Plaintiffs' argument that "WCS never even *considered* whether [assistive technology] was necessary" for G.A. (Doc. No. 43 at 5). See 34 C.F.R. § 300.5 ("Assistive technology device means any item, piece of equipment, or product system, whether acquired commercially off the shelf, modified, or customized, that is used to increase, maintain, or improve the functional capabilities of a child with a disability.").

now consider whether the violation 'result[ed] in the loss of educational opportunity, or seriously infringe[d] the parents' opportunity to participate in the IEP formulation process, or . . . caused a deprivation of educational benefits.").

Unfortunately for Plaintiffs' case, Plaintiffs cannot show WCS' failure to turn over the BOT-2 percentile data caused substantive harm. The percentile ranks are "not what's used to determine eligibility" for special education services. (Doc. No. 23-3 at 121). And WCS did share G.A.'s "scale" and "standard" scores from the BOT-2 assessment, which *are* "what's used to determine eligibility." (Id.; Doc. No. 23-5 at 436; Doc. No. 23-6 at 214; Doc. No. 36 at 12). Hence, WCS' failure to share the BOT-2 percentile ranks did not rob W.A. of her ability to meaningfully participate in the IEP process and did not affect G.A.'s education. For that reason, WCS' failure to share the percentile ranks did not cause substantive harm. See Barney, 763 F. App'x at 532; M.M., 767 F.3d at 855–56.

Similarly, WCS' failure to turn over the handwriting samples used in the ETCH-M assessment did not substantively harm W.A. or G.A. WCS shared the *results* of the assessment with W.A., which gave her a meaningful opportunity to participate in the IEP process. (Doc. No. 23-5 at 437). And it does not appear WCS caused any negative impact on G.A.'s education by failing to turn over the handwriting samples to W.A. Hence, Plaintiffs have not shown WCS' failure to share the handwriting samples caused substantive harm. See Barney, 763 F. App'x at 532; M.M., 767 F.3d at 855–56.

*Third*, Plaintiffs' argument that "WCS' failure to speak with G.A.'s providers also resulted in a flawed IEP because the IEP team members did not understand G.A" falls short. (Doc. No. 36 at 31). Plaintiffs do not explain how the IEP was flawed as a result of WCS' alleged failure to consult with providers. (Id.). The Court will reject Plaintiffs' argument because WCS had access

17

to reports from outside providers (Doc. No. 23-5 at 62–63); WCS has discretion to accept or reject the recommendations of such providers, see Hupp v. Switzerland of Ohio Loc. Sch. Dist., 912 F. Supp. 2d 572, 596 (S.D. Ohio 2012); and the Court is aware of no authority requiring a school district to speak directly to outside providers in constructing an IEP.

        2.    *WCS Did Not Violate the IDEA by Failing to Offer Counseling as a Related Service.*

Finally, contrary to Plaintiffs' argument, WCS did not violate the IDEA by failing to offer counseling as a related service. (Doc. No. 36 at 28). WCS developed a Student Safety Plan ("SSP") for G.A. in connection with his IEP. (Doc. No. 23-6 at 155). The SSP provided that a WCS staff member would "take [G.A.] to a designated safe room where he c[ould] cool down" whenever he was "feeling unsafe or emotionally distressed." (Id.). It also stated that G.A. would "visit our school counselor (Jane Allison Crewse) on a daily basis at an agreed upon time to ensure that the plan [was] working." (Id.). It is true the SSP did not require actual counseling, as Plaintiffs argue was necessary. But providing for daily check-ins with a counselor and designating a "safe room" for G.A. appears reasonably calculated to enable G.A. to progress in his education. Barney, 763 F. App'x at 533. Accordingly, the Court finds WCS' decision not to offer counseling as a related service did not violate the IDEA's substantive requirements.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Judgment on the Record (Doc. No. 35) will be denied.

An appropriate order will enter.

                                                 */s/ Waverly D. Crenshaw, Jr.*
                                                 WAVERLY D. CRENSHAW, JR.
                                                 CHIEF UNITED STATES DISTRICT JUDGE